AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Western District of Washington

FILED _____ LODGED
_____ RECEIVED

JAN 03 2018

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY_____ DEPUTY

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) )  Case No.  MJ18-5001 |
| The Facebook account with user ID /Katherine.Thomas.104418 | ) ) ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, attached hereto and incorporated by reference herein.

located in the _____Western_____ District of _____Washington_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) and 846 | Distribution of and Conspiracy to Distribute Controlled Substances |

The application is based on these facts:

See Affidavit of DEA Special Agent Samuel T. Landis.

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of _365_ days (give exact ending date if more than 30 days: _01/02/2019_ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Samuel T. Landis, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _1/3/18_

_____
*Judge's signature*

City and state: Tacoma, Washington

J. Richard Creatura, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

STATE OF WASHINGTON    )
                       )   ss
COUNTY OF PIERCE       )

I, Samuel T. Landis, Special Agent, Drug Enforcement Administration (DEA), United States Department of Justice, being first duly sworn on oath, depose and state:

## MY BACKGROUND AND QUALIFICATIONS

1.      I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I am a Special Agent with the Drug Enforcement Administration (DEA), and have been so employed since March of 2016.  I am currently assigned to the Seattle Field Division, Tacoma Resident Office.  Prior to my employment with the DEA, I was employed as a Border Patrol Agent from November 2009 to March 2016.

3.      I received formal training at the DEA Basic Agent Training Academy in Quantico, Virginia.  The 22-week training included comprehensive, formalized instruction in, among other things:  basic narcotic investigations, drug identification and detection, familiarization with United States narcotics laws, financial investigations and money laundering, identification and seizure of drug-related assets, organized crime investigations, physical and electronic surveillance, and undercover operations.  In addition to Basic Agent Training, I have completed Money Laundering Training, Traps and Concealed Compartments Training, and other various courses that have familiarized me with investigations of drug trafficking organizations, methods of importation and distribution of controlled substances, and financial investigations.

4.      During the course of my law enforcement career, I have been involved in investigations of narcotics offenses, including offenses involved in this current investigation.  I have participated in criminal investigations of drug-trafficking

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 1 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   organizations (DTOs), ranging from street-level dealers to larger dealers, including

2   Mexican-based DTOs.  These investigations have included the unlawful importation,

3   possession with intent to distribute, and distribution of controlled substances; the related

4   laundering of monetary instruments; the conducting of monetary transactions involving

5   the proceeds of specified unlawful activities; and conspiracies associated with these

6   offenses.

7        5.      As noted above, prior to my employment with the DEA, I was employed

8   with the United States Border Patrol as a Border Patrol Agent for more than six years.

9   During my time as a Border Patrol Agent, I intercepted narcotics from narcotics

10  traffickers/smugglers as part of my regular duties.  Furthermore, I assisted the DEA and

11  Homeland Security Investigations with mid- and upper-level drug investigations in at

12  least fifteen cases.  My experience as a Border Patrol Agent familiarized me with the

13  methods used by narcotics traffickers/smugglers to transport narcotics to transport

14  narcotics, firearms, and bulk currency into and out of the United States.

15                          **PURPOSE OF AFFIDAVIT**

16       6.      This Affidavit is submitted in support of an application for a search warrant

17  under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A)

18  to require Facebook to disclose to the government records and other information in its

19  possession, pertaining to the subscriber or customer associated with the following

20  Facebook account (the "SUBJECT ACCOUNT"):

21            a.      Facebook user ID /Katherine.Thomas.104418 registered under the

22  name KATHERINE THOMAS.

23       7.      All of the requested information is stored at premises owned, maintained,

24  controlled, or operated by Facebook, a social networking company headquartered in

25  Menlo Park, California.  The information to be searched is described in the following

26  paragraphs and in Attachment B.  This is the first application for a search warrant of the

27  SUBJECT ACCOUNT in this investigation.

28

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

– 2 –

## FACEBOOK INFORMATION STORAGE

8.      I am aware from my experience and training, and consultation with other investigators, of the following information about Facebook:

9.      Facebook owns and operates a free-access social networking website of the same name, accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

10.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail address(es), Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

11.     I know from speaking with other law enforcement that "cookies" are small files placed by a server (such as those used by Facebook) on a device to track the user and potentially verify a user's authentication status across multiple sites or webpages.  This cookie could be unique to a particular account (e.g., the Facebook account) or to a given device (e.g., the particular phone used to access the Facebook account).  The next time a user visits a particular site or server, the server will ask for certain cookies to see if the server has interacted with that user before.  Cookies can also be used to determine "machine cookie overlap," or multiple accounts that have been accessed by the same individual machine (e.g., two Facebook accounts that have been accessed on the same phone).  The machine cookie overlap thus allows Facebook to track accounts that are "linked" to each other because the same user account (username on a computer) on the same device accessed multiple Facebook accounts.  This can identify either multiple Facebook accounts used by the same person or used by different people

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 3 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  sharing the same user account and device.  In either case, the machine cookie overlap

2  means that the users of the linked accounts are the same person or two people in close

3  proximity to each other (by virtue of them using the same device).

4      12.    Facebook users may join one or more groups or networks to connect and

5  interact with other users who are members of the same group or network.  Facebook

6  assigns a group identification number to each group.  A Facebook user can also connect

7  directly with individual Facebook users by sending each user a "Friend Request."  If the

8  recipient of a "Friend Request" accepts the request, then the two users will become

9  "Friends" for purposes of Facebook and can exchange communications or view

10  information about each other.  Each Facebook user's account includes a list of that user's

11  "Friends" and a "News Feed," which highlights information about the user's "Friends,"

12  such as profile changes, upcoming events, and birthdays.

13      13.    Facebook users can select different levels of privacy for the

14  communications and information associated with their Facebook accounts.  By adjusting

15  these privacy settings, a Facebook user can make information available only to himself or

16  herself, to particular Facebook users, or to anyone with access to the Internet, including

17  people who are not Facebook users.  A Facebook user can also create "lists" of Facebook

18  friends to facilitate the application of these privacy settings.  Facebook accounts also

19  include other account settings that users can adjust to control, for example, the types of

20  notifications they receive from Facebook.

21      14.    Facebook users can create profiles that include photographs, lists of

22  personal interests, and other information.  Facebook users can also post "status" updates

23  about their whereabouts and actions, as well as links to videos, photographs, articles, and

24  other items available elsewhere on the Internet.  Facebook users can also post information

25  about upcoming "events," such as social occasions, by listing the event's time, location,

26  host, and guest list.  In addition, Facebook users can "check in" to particular locations or

27  add their geographic locations to their Facebook posts, thereby revealing their geographic

28  locations at particular dates and times.  A particular user's profile page also includes a

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 4 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  "Wall," which is a space where the user and his or her "Friends" can post messages,

2  attachments, and links that will typically be visible to anyone who can view the user's

3  profile.

4       15.    Facebook allows users to upload photos and videos.  It also provides users

5  the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is

6  tagged in a photo or video, he or she receives a notification of the tag and a link to see the

7  photo or video.  For Facebook's purposes, the photos and videos associated with a user's

8  account will include all photos and videos uploaded by that user that have not been

9  deleted, as well as all photos and videos uploaded by any user that have that user tagged

10  in them.

11       16.    Facebook users can exchange private messages on Facebook with other

12  users.  These messages, which are similar to e-mail messages, are sent to the recipient's

13  "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well

14  as other information.  Facebook users can also post comments on the Facebook profiles

15  of other users or on their own profiles; such comments are typically associated with a

16  specific posting or item on the profile.  In addition, Facebook has a Chat feature that

17  allows users to send and receive instant messages through Facebook.  These chat

18  communications are stored in the chat history for the account.  Facebook also has a Video

19  Calling feature, and although Facebook does not record the calls themselves, it does keep

20  records of the date of each call.

21       17.    If a Facebook user does not want to interact with another user on Facebook,

22  the first user can "block" the second user from seeing his or her account.

23       18.    Facebook has a search function that enables its users to search Facebook for

24  keywords, usernames, or pages, among other things.

25       19.    Each Facebook account has an activity log, which is a list of the user's

26  posts and other Facebook activities from the inception of the account to the present.  The

27  activity log includes stories and photos that the user has been tagged in, as well as

28  connections made through the account, such as "liking" a Facebook page or adding

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

– 5 –

1  someone as a friend.  The activity log is visible to the user but cannot be viewed by

2  people who visit the user's Facebook page.

3      20.    Facebook Notes is a blogging feature available to Facebook users, and it

4  enables users to write and post notes or personal web logs ("blogs"), or to import their

5  blogs from other services, such as Xanga, LiveJournal, and Blogger.

6      21.    In addition to the applications described above, Facebook also provides its

7  users with access to thousands of other applications on the Facebook platform.  When a

8  Facebook user accesses or uses one of these applications, an update about that the user's

9  access or use of that application may appear on the user's profile page.

10     22.    Some Facebook pages are affiliated with groups of users, rather than one

11  individual user.  Membership in the group is monitored and regulated by the

12  administrator or head of the group, who can invite new members and reject or accept

13  requests by users to enter.  Facebook can identify all users who are currently registered to

14  a particular group and can identify the administrator and/or creator of the group.

15  Facebook uses the term "Group Contact Info" to describe the contact information for the

16  group's creator and/or administrator, as well as a PDF of the current status of the group

17  profile page.

18     23.    Facebook uses the term "Neoprint" to describe an expanded view of a given

19  user profile.  The "Neoprint" for a given user can include the following information from

20  the user's profile:  profile contact information; News Feed information; status updates;

21  links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists,

22  including the friends' Facebook user identification numbers; groups and networks of

23  which the user is a member, including the groups' Facebook group identification

24  numbers; future and past event postings; rejected "Friend" requests; comments; gifts;

25  pokes; tags; and information about the user's access and use of Facebook applications.

26     24.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP

27  address.  These logs may contain information about the actions taken by the user ID or IP

28  address on Facebook, including information about the type of action, the date and time of

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 6 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  the action, and the user ID and IP address associated with the action.  For example, if a

2  user views a Facebook profile, that user's IP log would reflect the fact that the user

3  viewed the profile, and would show when and from what IP address the user did so.

4      25.  Social networking providers like Facebook typically retain additional

5  information about their users' accounts, such as information about the length of service

6  (including start date), the types of service utilized, and the means and source of any

7  payments associated with the service (including any credit card or bank account number).

8  In some cases, Facebook users may communicate directly with Facebook about issues

9  relating to their accounts, such as technical problems, billing inquiries, or complaints

10  from other users.  Social networking providers like Facebook typically retain records

11  about such communications, including records of contacts between the user and the

12  provider's support services, as well as records of any actions taken by the provider or

13  user as a result of the communications.

14      26.  Therefore, the computers of Facebook are likely to contain all the material

15  described above, including stored electronic communications and information concerning

16  subscribers and their use of Facebook, such as account access information, transaction

17  information, and other account information.  I believe such information is likely to

18  constitute evidence of the drug trafficking crimes currently under investigation.

19  **SUMMARY OF PROBABLE CAUSE**

20      27.  The information set forth in this Affidavit consists of information I have

21  gathered and observed firsthand through the course of this investigation to date, as well

22  as information relayed to me by other law enforcement personnel, my review of law

23  enforcement reports, interviews of witnesses, and my review and analysis of toll records.

24  Since I am submitting this Affidavit for the limited purpose of obtaining authorization to

25  search the SUBJECT ACCOUNT as described herein, I have not included every fact

26  known to me concerning this investigation.  I have set forth only the facts that I believe

27  are essential to establish the necessary foundation for the issuance of such warrant.

28

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

-7-

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

*Information Gathered From CS*

28.     During the month of August 2017, the Bremerton Police Department (BPD) Special Operations Group (SOG) was investigating a suspected local heroin dealer reportedly purchasing heroin from a Hispanic individual in the Snohomish and King County areas.  SOG conducted controlled buys from the local dealer, and eventually detained him/her during a traffic stop.  During the stop, detectives discovered a large amount of cash, which the dealer claimed he/she owed as a drug "front" to a Mexican drug trafficking organization (DTO).  The dealer then agreed to cooperate with law enforcement and was signed up as a Confidential Source (CS).

29.     The CS advised SOG that he/she had been selling various controlled substances for several years. According to the CS, he/she has been in contact with a group of Mexicans who sell heroin in the Puget Sound region. Within that organization, the CS connected with a prominent drug trafficker whom the CS knew as "Juan" or "Jose." The CS believes the individual he/she knew as "Juan" was the local leader of the drug distribution at that time, and was later promoted to a larger role in the DTO.

30.     BPD Detective (Det) Jordan Ejde located a Facebook account under the name of "Juan Andres CASTRO Valenzuela" that the CS and other local suspected drug dealers were associated with. Det. Ejde questioned the CS about the account and the CS confirmed CASTRO was the male whom he/she referred to as "Juan" or "Jose."  The CS also showed Det. Ejde messages confirming that CASTRO was in contact with the CS recently, using the account in his (CASTRO's) name. According to the CS and the Facebook data he/she provided, he/she has been talking to CASTRO via Facebook Messenger for purposes of making drug transactions since approximately June of 2016.

31.     A review of the CS's Facebook account showed CASTRO also contacted the CS from additional Facebook accounts under the names of "Rebeca Spencer," "Annel Baker," and "KATHERINE THOMAS." A review of the CS's phone showed CASTRO also used Mexican phone numbers 52-668-199-4039, 52-668-248-4230, 52-668-225-5890, and 52-668-199-5533 to communicate with the CS via text message and voice

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 8 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  calls. The "KATHERINE THOMAS" Facebook account and phone number 52-668-199-

2  4039 were CASTRO's most current methods of drug related communications with the

3  CS.

4      32.    Det. Ejde and Special Agent (SA) Anthony DelVecchio have confirmed

5  CASTRO's identity via the Washington State Department of Licensing (WADOL).

6  Specifically, CASTRO's WADOL photograph matches that of the individual on the Juan

7  Andres CASTRO Valenzuela Facebook account. Furthermore, according to a law

8  enforcement database, CASTRO was involved as a suspected "cell head" for heroin

9  distribution in the Everett area during a DEA investigation that took place in 2012. SA

10  DelVecchio researched this prior DEA case and found that CASTRO was, in fact, the

11  primary target of investigation within that case.

12      33.    CASTRO has used the aforementioned Facebook accounts, as well as

13  various telephone numbers, to set up drug deals with the CS. According to the CS,

14  CASTRO typically arranges the transaction, but sends a Hispanic male to conduct the

15  transaction with the CS. The CS explained that he/she has met several different Hispanic

16  males across the Puget Sound region to conduct these drug transactions. The CS told law

17  enforcement that he/she typically purchased 1-2 ounces of heroin several times per week.

18      34.    Recently, after talking to CASTRO and arranging for a heroin purchase, the

19  CS met with an Hispanic male the CS knows as "Miguel." Investigators identified

20  "Miguel" as Jesus Rene SARMIENTO Valenzuela by comparing surveillance

21  photographs of CASTRO DTO members, SARMIENTO's Facebook account, and his

22  visa information from the United States Department of Homeland Security.

23      35.    Utilizing the CS, SOG has conducted seven controlled purchases of

24  suspected heroin from CASTRO through SARMIENTO, totaling approximately 136.6

25  grams. Prior to and after each controlled purchase of heroin, detectives searched the CS

26  and his/her vehicle, and provided the CS with pre-recorded SOG funds to make each

27  purchase of heroin. During the course of each controlled purchase, investigators

28  maintained surveillance on the CS. After each purchase, detectives tested the suspected

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 9 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 heroin using a NIK test kit with presumptive positive results for the presence of heroin,

2 and then processed the heroin according to SOG's policies and procedures. For the

3 second through sixth controlled purchases, detectives recorded the buys with a covert

4 surveillance camera.

5 **Undercover Controlled Purchase #1 Utilizing the SUBJECT ACCOUNT**

6       36.    In early November 2017, SOG provided DEA agents, including an

7 undercover agent (the UC) with the various phone numbers and Facebook accounts they

8 believed CASTRO and SARMIENTO used for drug trafficking purposes.

9       37.    On November 14, 2017, the CS sent the UC an invitation to join a group

10 Facebook Messenger chat session, which linked the UC in communication with the

11 SUBJECT ACCOUNT.  The following is a transcript of the discussion between

12 CASTRO and the UC.  During the conversation, the UC used the terms "brown" and

13 "piece." From training and experience, agents know heroin to be referred to as "brown"

14 and an ounce to be referred to as "piece." These terms are common language within the

15 drug community, and in order to appear knowledgeable and experienced, the UC used

16 them.

17     •    UC: "Hello fellas, appreciate the intro"

18     •    CASTRO: "How are you?"

19     •    UC: "Besides all the rain, everything is good. Yourself"

20     •    CASTRO: "good..."

21     •    UC: "Up for some business this week?"

22     •    CASTRO: [Thumbs up graphic]

23     •    UC: "I'd like two pieces of brown, what would that cost"

24     •    CASTRO: "look, 1 is $1150...but if you want buy 2 or 3 is $1075...if you

25         buy 4 or more is $1,025"

26     •    UC: "I want 2. Can we do it Thursday?"

27     •    CASTRO: "ok"

28

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 10 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

- • CASTRO: "yes"

- • UC: "Where do you want me to go?"

- • CASTRO: "Kent, maybe Tacoma..."

- • UC: "OK"

38.     On November 16, 2017, agents conducted an undercover purchase of heroin from SARMIENTO at the Krispy Kreme at 4302 Tacoma Mall Boulevard, Tacoma, Washington. The UC contacted CASTRO on 52-668-199-4039 (Target Telephone 1 or TT1) and the SUBJECT ACCOUNT prior to this transaction in order to facilitate the meeting. The UC also contacted SARMIENTO on his telephone, 253-398-5638 (Target Telephone 3 or TT3), prior to and during this transaction. The following conversations are noteworthy communications leading up to the controlled purchase of heroin from CASTRO through SARMIENTO, and include what I believe to be pertinent interactions with SARMIENTO (known to the UC as "Miguel"), to include statements SARMIENTO made to the UC during the undercover purchase on November 16, 2017, obtained through the UC's use of an electronic monitoring device that recorded the audible interactions between the UC and SARMIENTO.

39.     From 10:24 a.m. to 10:31 a.m., the UC and CASTRO, using the SUBJECT ACCOUNT, had the following Facebook messenger conversation:

- • CASTRO: "send me you phone number please"

- • UC: "No problem, 360-362-8770"

- • CASTRO: "ok...I will send text to you"

- • UC: "Sounds good"

40.     At 10:36 a.m., the UC received a text message from TT1.  Between 10:36 a.m. and 11:16 a.m., the UC and CASTRO had the following text message conversation:

- • CASTRO: "I'm in way to camp with my family, my phone service will be very bad at next hour to tomorrow..."

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 11 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

- CASTRO: "if you need something send text to my cousin Miguel please...253-398-5638"
- UC: "Got it thanks enjoy the camping trip amigo"
- UC: "I'll text him today for sure"
- UC: "Will your guy still be able to get me the 2 today?"
- CASTRO: "Hey"
- UC: "Hey, just asking if your guy can still do 2 today?"
- CASTRO: "What number are you sending me messages from?"
- CASTRO: "but yes, he is ready for you"
- UC: "I'm sending messages from my cell"

41.    At 11:15 a.m., the UC texted "Miguel" at TT3.  From 11:15 a.m. to 11:35 a.m., the UC and "Miguel" had the following text message conversation:

- UC: "Hey Miguel, this is Steve. I was told to talk to you about doing some business today. Are you good for 2 this afternoon?"
- Miguel: "Yes ok"
- Miguel: "Good"
- Miguel: "at that time are you come by the material"
- UC: "I don't know what time I'll be up there, but can I get 2?"
- Miguel: "Ok"
- Miguel: "I can post-1 p.m."
- UC: "Good"

42.    From 1:24 p.m. to 1:42 p.m., the UC and "Miguel" had the following conversation via text message:

- Miguel: "Where are you"
- UC: "I'm in Olympia, you want to meet in Tacoma?"
- Miguel: "Its ok"
- UC: "Do you know where the mall is? I can go there easy."

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 12 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

- Miguel: "How long you are there"
- Miguel: "Yes in Tacoma mall ok"
- UC: "30 minutes"
- UC: "Meet at the Krispy Kreme?"
- Miguel: "My gps tell 50 min its ok mh friend"
- UC: "Sure amigo, that's ok"

43.     About an hour later, the UC arrived at 4302 Tacoma Mall Boulevard, Tacoma, Washington (the Krispy Kreme address), and parked facing south. At 2:33 p.m., "Miguel" texted the UC that, "In 10 min im, there." Between 2:36 p.m. and 2:41 p.m., the UC and "Miguel" had the following conversation via text message:

- UC: "I am parked in a truck at the place"
- Miguel: "What is your car"
- UC: "Blue Ford F-150"
- Miguel: "Ok"
- Miguel: "I have red car getta"
- Miguel: "Red car"
- Miguel: "In 2 min"
- UC: "Ok"

44.     Minutes later, the UC observed a red Volkswagen Jetta drive into the Krispy Kreme and park nearby. A Hispanic male, mid-thirties, with a beard and dark sweatshirt, motioned for the UC to get into the Jetta. The UC acknowledged, exited his vehicle, and got into the Jetta's front passenger seat. The Hispanic male introduced himself as "Miguel," the UC introduced himself as "Steve," and the men shook hands. They made small talk about the bad traffic in the area, and then "Miguel" asked the UC if the deal was for "two pieces." The UC nodded his head and handed "Miguel" $2,150 in buy money.

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 13 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1       45.    The UC watched "Miguel" count the money, and confirmed the total

2   amount of $2,150. "Miguel" gave the UC a plastic baggie that contained suspected

3   heroin. Shortly thereafter, "Miguel" nodded toward the door and told the UC that he

4   would "see him next time." Agents transported the suspected heroin to the DEA Tacoma

5   Resident Office where it was weighed at approximately 87.4 gross grams.

6   ***Undercover Controlled Purchase #2 Utilizing the SUBJECT ACCOUNT***

7       46.    On November 27, 2017, the UC received a text message from CASTRO(

8   TT1). During this conversation, the UC and CASTRO discussed a future drug transaction

9   that would later occur on November 30, 2017. The UC said, "I am trying to get money

10  together for 4…," meaning he wanted to purchase four ounces of heroin. The UC and

11  CASTRO (TT1) had the following text message conversation:

12          •    CASTRO:  "amigo, everything it's ok?"

13          •    UC:  "Amigo, everything is good here. Just got back home. How are

14                   you doing? This is Steve"

15          •    CASTRO:  "ok..."

16          •    UC:  "Can we do business Thursday?"

17          •    CASTRO:  "yes"

18          •    UC:  "Excellent!"

19          •    UC:  "I am trying to get money together for 4, would that be ok?"

20          •    CASTRO:  "ok"

21          •    UC:  "Cool!"

22          •    UC:  "Anymore camping trips planned amigo?"

23      47.    On November 30, 2017, agents conducted an undercover purchase of

24  heroin from CASTRO, through SARMIENTO, at the Buffalo Wild Wings at 2005 South

25  320th Street, Federal Way, Washington. The following are noteworthy communications

26  between the UC and CASTRO while setting up the second controlled purchase, and the

27  UC's interactions with SARMIENTO, to include statements SARMIENTO made to the

28

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 UC during the undercover purchase on November 30, 2017, obtained through the UC's

2 use of an electronic monitoring device that recorded the audible interactions between the

3 UC and SARMIENTO.

4    48.    At 1:01 p.m., the UC initiated a Facebook Messenger conversation with

5 CASTRO at the SUBJECT ACCOUNT. The following transcript reflects the discussion

6 between 1:01 p.m. and 1:26 p.m.:

7    • UC: "Hey Amigo, I was able to get the money. Are we still good for

8      4 today?"

9    • CASTRO: "yes"

10   • UC: "Very nice, should I contact Miguel like last time?"

11   • CASTRO: "yes, or to me..."

12   • UC: "Ok, where would you like me to go?"

13   • CASTRO: "Deppend what time you can go"

14   • CASTRO: "where you live?"

15   • UC: "I live near Olympia, south of Tacoma"

16   • CASTRO: "ok"

17   • UC: "I can get to Tacoma Mall like last time. What do you think?"

18   • CASTRO: "what time?"

19   • UC: "2:30?"

20   • CASTRO: "2:30 you will leave? or 2:30 you will be at Tacoma?"

21   • UC: "I will be at Tacoma"

22   • CASTRO: "Ok, go"

23   • UC: "Ok"

24   49.    Using the SUBJECT ACCOUNT, CASTRO told the UC that he changed

25 the meet location from the Tacoma Mall to the Buffalo Wild Wings at 2005 South 320th

26 Street, Federal Way, Washington 98003. The following conversation from 2:44 p.m. to

27 2:46 p.m. includes the location change and subsequent acknowledgement by the UC:

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 15 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    • CASTRO: "2005 South 320th Street, Federal Way, WA 98003, EE.

2    UU.[1] is a Buffalo wild wings"

3    • CASTRO: "please go there"

4    • UC: "Ok amigo, headed that way"

5    50.  From 2:59 p.m. to 3:43 p.m., the UC and CASTRO, using the SUBJECT

6    ACCOUNT, had the following conversation via Facebook messenger:

7    • CASTRO: "how long you will be there?"

8    • UC: "15 minutes"

9    • CASTRO: "ok"

10   • CASTRO: "You're driving same car?"

11   • UC: "Yes"

12   • UC: "Same car for you?"

13   • CASTRO: "same too"

14   • CASTRO: "my cousin is there waiting for you"

15   • UC: "Ok, good. I'll hurry up."

16   • CASTRO: "how long?"

17   • CASTRO: "??"

18   • UC: "5 minutes"

19   • CASTRO: "ok"

20   • UC: "Where is he parked at Buffalo Wild Wings?"

21   • CASTRO: "yes, just front at mall door."

22   • UC: "ok"

23   • CASTRO: "you're there??"

24   • CASTRO: "??"

25   • UC: "yes, off the exit and am there."

---

[1] I know that "EE. UU." is a Spanish-language abbreviation for "Los Estados Unidos," i.e., the United States.

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 16 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1      • CASTRO: "ok ok"

2      • CASTRO: "hey what's happening??"

3      • UC: "I'm there"

4      • CASTRO: "ok"

5      • CASTRO: "where you are parked?"

6      51.    The UC then drove into the parking area of the Buffalo Wild Wings, and

7    parked. The UC received two calls from CASTRO. Of note, Facebook Messenger has

8    telephone call capabilities as well as video chat.  The first phone call came through

9    Facebook Messenger under the SUBJECT ACCOUNT, and the second call came from

10    TT1.  The UC ignored the calls and asked CASTRO, through the SUBJECT ACCOUNT,

11    "where is he?"  CASTRO responded that his cousin was "walking to the car."

12      52.    Moments later, the UC identified SARMIENTO walking towards the UC's

13    vehicle. SARMIENTO was wearing a black baseball cap, dark jacket and sweater, with

14    black pants. The UC watched SARMIENTO move alongside the passenger side of the

15    vehicle, and enter the front passenger seat. The UC took $4,100 in buy money, wrapped

16    in a plastic bag, from his sweatshirt pocket, and gave it to SARMIENTO, who began

17    counting it.  During his count, the UC asked SARMIENTO what he had done over the

18    holiday. SARMIENTO smiled, and responded that he had partied with friends at the

19    "store." The UC asked if he worked at the "store," and SARMIENTO said that he did.

20    Once SARMIENTO finished counting, he looked at the UC and stated, "$4,300?" The

21    UC responded "$4,100," to which SARMIENTO nodded his head.

22      53.    Moments later, SARMIENTO motioned with his hand to drive forward.

23    The UC nodded and began to drive slowly through the parking lot until SARMIENTO

24    told the UC to stop. SARMIENTO then reached near his waist and took out a brown

25    bundle of suspected heroin, tightly wrapped in plastic. SARMIENTO placed the brown

26    bundle in the plastic bag the money had previously been in and then left it on the floor

27    near the middle console of the vehicle. SARMIENTO and the UC parted ways after the

28

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 17 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  exchange. Agents transported the suspected heroin to the TRO where it was weighed at

2  approximately 136.1 gross grams.

3      54.     Shortly after the UC and SARMIENTO parted ways, CASTRO sent a large

4  "thumbs up" graphic to the UC via the SUBJECT ACCOUNT, indicating a successful

5  drug transaction.

6      55.     Later that afternoon, the UC attempted to call the SUBJECT ACCOUNT.

7  CASTRO did not answer the call, but instead initiated a text conversation through the

8  SUBJECT ACCOUNT that lasted from 5:14 p.m. to 5:26 p.m. The following transcript

9  reflects this conversation:

10         •   CASTRO:  "what's up??"

11         •   UC:  "Nothing important, just appreciate your cousin finding me

12             today. It was good"

13         •   CASTRO: [thumbs up graphic]

14  **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

15      56.     I anticipate executing this warrant under the Electronic Communications

16  Privacy Act, in particular Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A)

17  and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the

18  government copies of the records and other information (including the content of

19  communications) particularly described in Section I of Attachment B.  Upon receipt of

20  the information described in Section I of Attachment B, government-authorized persons

21  will review that information to locate the items described in Section II of Attachment B.

22      57.     As indicated in the Application and Order for Non Disclosure that

23  accompany this Affidavit, the government requests, pursuant to the preclusion of notice

24  provisions of Title 18, United States Code, Section 2705(b), that Facebook be ordered not

25  to notify any person (including the subscriber or customer to which the materials relate)

26  of the existence of this warrant for such period as the Court deems appropriate, not to

27  exceed one year.  The government submits that such an order is justified because

28

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 18 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   notification of the existence of this Order would seriously jeopardize the ongoing

2   investigation.  Such a disclosure would give the subscriber an opportunity to destroy

3   evidence, change patterns of behavior, notify confederates, or flee from prosecution.

4   Notifying our targets of the existence of this investigation will likely cause them to

5   destroy evidence, flee the jurisdiction, or alter their methods, thus making it more

6   difficult to dismantle the organization effectively.  Notice also could put the CS, UC, and

7   agents working with them in danger.  For all the same reasons, I am requesting that the

8   Court allow the government to delay notification of this warrant for the same period, not

9   to exceed one year.

10       58.     It is further respectfully requested that this Court issue an order sealing all

11  papers submitted in support of this application, including the application and search

12  warrant, until further order of the Court, for a period not to exceed one year.  I believe

13  that sealing this document is necessary because the items and information to be searched

14  and seized are relevant to an ongoing investigation.  Premature disclosure of the contents

15  of this Affidavit and related documents may have a significant and negative impact on the

16  continuing investigation and may severely jeopardize its effectiveness.

17                **COMMON CHARACTERISTICS OF DRUG TRAFFICKERS**

18       59.     Based on my training and experience, including experience obtained

19  through participation in this and other investigations involving the distribution of

20  controlled substances, including those targeting long-term conspiracies responsible for

21  the distribution of controlled substances, and based upon my consultation with other

22  experienced law enforcement agents and officers, I know that:

23       a.      Drug trafficking conspiracies, especially those involving large amounts of

24  narcotics and interstate shipments, usually take place over several months or years, and

25  continue to operate even when enforcement activity results in arrests and/or seizures of

26  drugs and/or money.

27       b.      Those involved in the distribution of illicit drugs often communicate by

28  telephone in connection with their illegal activities in order to set up meetings with

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1 | coconspirators, conduct drug transactions, or to arrange for the transportation drugs or
2 | drug proceeds.

### **CONCLUSION**

4 |     60.    Based upon the information which has been uncovered during the course of
5 | this investigation, and on the advice, experience, knowledge of other agents and officers
6 | involved in this investigation, I believe these facts establish probable cause to conclude
7 | that the SUBJECT ACCOUNT has been used, and will continue to be used, to facilitate
8 | violations of the Controlled Substances Act, specifically distribution of narcotics,
9 | conspiracy, and related offenses in the Western District of Washington, and elsewhere, in
10 | violation of the Controlled Substances Act, Title 21, United States Code, Sections 841
11 | and 846.

SAMUEL T. LANDIS,
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me this _3rd_ day of January, 2018.

J. RICHARD CREATURA
UNITED STATES MAGISTRATE JUDGE

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 20 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following account, identified by Facebook user ID: /Katherine.Thomas.104418 (the "SUBJECT ACCOUNT"), for all such information that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.  This warrant is limited to information created after June 1, 2016.

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1

**ATTACHMENT B**

2

**Particular Things to be Seized**

3  I.   **Information to be disclosed by Facebook**

4   To the extent that the information described in Attachment A is within the

5  possession, custody, or control of Facebook, including any messages, records, files, logs,

6  or information that have been deleted but are still available to Facebook, or have been

7  preserved pursuant to a request made under Title 18, United States Code, Section 2703(f),

8  Facebook is required to disclose the following information to the government for the user

9  ID listed in Attachment A (the "SUBJECT ACCOUNT"):

10   A. The following information about the customer or subscriber of the SUBJECT

11     ACCOUNT:

12     (a)   All contact and personal identifying information, including full name, user

13       identification number, birth date, gender, contact e-mail addresses,

14       Facebook passwords, Facebook security questions and answers, physical

15       address (including city, state, and zip code), telephone numbers, screen

16       names, websites, and other personal identifiers.

17     (b)   All activity logs for the SUBJECT ACCOUNT and all other documents

18       showing the user's posts and other Facebook activities;

19     (c)   All photos and videos in their original format, including EXIF information

20       (metadata), uploaded by that user ID and all photos and videos in their

21       original format, including EXIF information (metadata), uploaded by any

22       user that have that user tagged in them;

23     (d)   All other records of communications and messages made or received by the

24       user, including all private messages, chat history, calling history, and

25       pending "Friend" requests;

26     (e)   All "check ins" and other location information;

27     (f)   All IP logs, including all records of the IP addresses that logged into the

28       SUBJECT ACCOUNT;

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

(g)     All past and present lists of friends created by the SUBJECT ACCOUNT;

(h)     All records of Facebook searches performed by the SUBJECT ACCOUNT;

(i)     The length of service (including start date);

(j)     The means and source of payment for such service (including any credit card or bank account number) and billing records;

(k)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken;

(l)     Names (including subscriber names, Facebook user IDs, and screen names);

(m)     Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

(n)     Local and long distance telephone connection records;

(o)     Linked accounts; and

(p)     Telephone or instrument numbers or identities (including MAC addresses).

B.  All records and other information (not including the contents of communications) relating to the SUBJECT ACCOUNT, including:

(a)     Records of user activity for each connection activity for each connection made to or from the SUBJECT ACCOUNT, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination of Internet Protocol addresses;

(b)     Information about each communication sent or received by the SUBJECT ACCOUNT, including the date and time of the communication, the method of the communication (such as source and destination email addresses, IP addresses, and telephone numbers); and

(c)     Records of any Facebook accounts that are linked to the SUBJECT ACCOUNT by machine cookies (meaning all Facebook user IDs that

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 23 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1    logged into Facebook by the same machine or device as the SUBJECT

2    ACCOUNT).

3  **II.   Information to be seized by the government**

4    All information described above in Section I that relates to the ongoing narcotics

5  investigation described in the Affidavit (i.e., felony violations of Title 21, United States

6  Code, Sections 841(a)(1) and 846, Distribution of and Conspiracy to Distribute

7  Controlled Substances), including, for the user ID identified on Attachment A,

8  information pertaining to the following matters:

9    (a) Any content including e-mails, messages, texts, photographs (including

10    metadata), videos (including metadata), visual images, documents,

11    spreadsheets, address lists, contact lists or communications of any type

12    which could be used to identify the user and or their location.

13    (b) Records relating to who created, used, or communicated with the user ID,

14    including records about their identities and whereabouts.

15    (c) All subscriber records associated with the SUBJECT ACCOUNT,

16    including name, address, local and long distance telephone connection

17    records, or records of session times and durations, length of service

18    (including start date) and types of service utilized, telephone or instrument

19    number or other subscriber number or identity, including any temporarily

20    assigned network address, and means and source of payment for such

21    service including any credit card or bank account number.

22    (d) Any and all other log records, including IP address captures, associated

23    with the SUBJECT ACCOUNT; and

24    (e) Any records of communications between Facebook and any person about

25    issues relating to the account, such as technical problems, billing inquiries,

26    or complaints from other users about the SUBJECT ACCOUNT.  This is to

27    include records of contacts between the subscriber and the provider's

28

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

– 24 –

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

support services, as well as records of any actions taken by the provider or subscriber as a result of the communications.

AFFIDAVIT OF SPECIAL AGENT LANDIS
USAO 2017R01238

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

– 25 –